# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **JAMES P. KERR, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-10-4221** |
| | § | |
| **EXOBOX TECHNOLOGIES** | § | |
| **CORPORATION, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the following motions:

(1) Defendant Robert L. Sonfield, Jr.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint for Failure to State a Claim upon which Relief Can Be Granted ("Sonfield's Motion to Dismiss") (Doc. No. 17);

(2) Defendant Jason Landess' Motion to Dismiss under Rule 12(b)(6) ("Landess' Motion to Dismiss") (Doc. No. 46);

(3) Defendant Exobox Technologies Corp.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint for Failure to State a Claim upon which Relief Can Be Granted ("Exobox's Motion to Dismiss") (Doc. No. 47);

(4) Defendant Exobox Technologies Corp.'s Motion for a More Definite Statement ("Exobox's Motion for a More Definite Statement") (Doc. No. 45); and

(5) Plaintiffs' Motion for Leave to Extend Time to File Response to Exobox's Motion to Dismiss ("Plaintiffs' Motion for Leave") (Doc. No. 53).

After considering the Motions, all responses thereto, and the applicable law, the Court

finds that:

(1) Sonfield's Motion to Dismiss should be granted in part;

(2) Landess' Motion to Dismiss should be granted;

(3) Exobox's Motion to Dismiss should be granted in part;

(4) Exobox's Motion for a More Definite Statement should be denied; and

(5) Plaintiffs' Motion for Leave should be granted.

## I.   BACKGROUND[1]

Plaintiffs, investors of Exobox Technologies Corporation ("Exobox"), bring claims against Exobox and the individual defendants for fraud and misrepresentation; violations of Texas and federal securities laws; and conspiracy and aiding and abetting fraud and violations of securities laws.  Plaintiffs allege that Defendants engaged in a scheme involving the issuance and sale of securities in violation of state and federal securities laws.  (*Id.* ¶ 1.) Since filing their Amended Complaint, Plaintiffs have voluntarily dismissed many of the individual defendants.[2] (Doc. No. 48.)  Therefore, the defendants that remain in this case are Robert L. Sonfield, Donald C. Bradley, Jeffrey W. Bradley, Jason Landess, Marc Lane, Roger Brewer, Alexanderia K. Blankenship, and Exobox Technologies Corporation.

Defendants Donald and Jeffrey Bradley established Kilis in 1999, which was designed as a shell corporation and never conducted any business operations.  (*Id.* ¶ 27.)  In 2000, the Bradleys caused Kilis to issue 22 certificates representing 1,915,000 shares of Kilis common stock (the "founders' certificates"), which were not encumbered with restrictive legends warning against reselling the shares into the public market.  (*Id.* ¶ 28.)  Many of the founders' certificates were issued to nominees who paid no consideration, did not receive the certificates, and were not aware the certificates had been issued in their own name.  (*Id.* ¶ 29.)  However, the Bradleys falsified Kilis' corporate records to indicate that the nominees had paid consideration and attended annual meetings, and further forged signatures on stock powers issued to them by

---

[1] The facts are taken from Plaintiffs' Amended Complaint (Doc. No. 16), and are accepted as true for purposes of the pending motions.

[2] Plaintiffs voluntarily dismissed Robert Dillon, Reginald Goodman, Michael Wittenburg, Marc Pernia, Michael Wirtz, Richard Evans, M.D., William Sklar, Leslie Danyel Owens-Swint, Scott Copeland, Sydney Barrett, and James L. Jimmerman.

various nominees to give them complete control over the Kilis stock.  (*Id.* ¶ 30.)  The Bradleys retained control over all of the founders' certificates until they were delivered to Defendant Sonfield in June 2005.  (*Id.* ¶ 31.)  Sonfield had knowledge of the Bradleys' complete control over the certificates and the methodology employed to obtain such control.  (*Id.*)

Sonfield began discussing with Defendants Lane and Brewer his intent to create, obtain control over, and sell stock in a company to make substantial sums of money.  (*Id.* ¶ 32.)  In June 2005, Sonfield proposed to Defendants Landess and the Bradleys that Kilis merge with JinPin, Inc., one of Sonfield's clients.  (*Id.*)  Landess and the Bradleys were to receive 10% of the stock in the resulting company.  (*Id.*)

Sonfield took possession and control of Kilis shortly thereafter.  (*Id.* ¶ 33.)  In June and September 2005, additional Kilis shares of unrestricted stock, which were fraudulently backdated to March 1, 2003, were issued in a series of transactions designed by Sonfield to "distribute" shares and hide the fact that he retained sole control over all the stock.  (*Id.* ¶ 34.)  Sonfield issued 100,000 shares of Kilis stock in the name of Jason Landess' step-brother for no consideration, but retained control over these shares by receiving a blank stock power from Landess' step-brother.  (*Id.*)  He issued another 100,000 shares to his legal assistant, who also paid no consideration for the stock, and issued 300,000 shares to an individual claiming to have been appointed as JinPin's principal.  (*Id.*)

Landess also filed documents with the Nevada Secretary of State reporting that Kilis had changed its name to JinPin and that the principal of JinPin had become Kilis' sole officer and director.  (*Id.* ¶ 35.)  Plaintiffs allege that Sonfield had knowledge of these filings and representations because the JinPin merger never closed and Sonfield retained control of virtually all of the outstanding shares of Kilis stock.  (*Id.*)

In August 2005, Sonfield, while still in control of the Kilis stock certificates, began representing Exobox and orchestrated transactions whereby Exobox would enter into a reverse merger with JinPin.  (*Id.* ¶ 36.)  Exobox ultimately agreed to enter the reverse merger with JinPin, based on Sonfield's advice.  (*Id.* ¶ 37.)  However, Sonfield failed to disclose:  (1) his earlier transactions with Landess and the Bradleys; (2) that he would own and/or control virtually all of Exobox's outstanding common stock upon completion of the reverse merger; and (3) and that certain share certificates were fraudulently backdated to March 1, 2003 to allow the shares to be freely traded under certain safe harbor provisions.  (*Id.*)  The reverse merger was finalized on September 15, 2005, and Exobox emerged as the surviving entity.  (*Id.* ¶ 38.)  Sonfield controlled over 88% of Exobox's public float.  (*Id.*)

Sonfield engaged an expert to value Exobox in order to place the shares of stock for sale on the market.  (*Id.* ¶ 39.)  When Sonfield and others, including Landess, failed to provide requested information and data to the expert to aid him in his valuation, the expert concluded that Exobox had no readily ascertainable value.  (*Id.*)  Sonfield, Landess, and others fraudulently tried to convince the expert to provide a significant value to Exobox and suggested certain numbers that they admitted did not represent Exobox's true value.  (*Id.*)

Despite their knowledge that Exobox had no value and that the shares of stock could not be sold to the general public, Sonfield and Landess undertook steps to facilitate the public trading of Exobox stock.  (*Id.* ¶ 40.)  Although he knew the stock certificates had been fraudulently backdated, Sonfield prepared and submitted a tradability opinion letter to the Pink Sheets, LLC on October 7, 2005, which stated that virtually all the shares of Exobox "may be sold immediately in the public market . . . on the safe harbor of Rule 144(k) under the Securities Act."  (*Id.*)

4

On or about October 14, 2005, Exobox stock began trading in the Over-the-Counter Bulletin Board. (*Id.* ¶ 41.) Defendants began manipulating the stock prices through the sales of Exobox stock; Exobox's share price reached a high of $22.00 and stabilized at approximately $15.00 on very limited volume. (*Id.*)

On or about October 15, 2005, Sonfield instructed his legal assistant to sell her shares, which had become 450,000 shares of stock in Exobox after the reverse merger. (*Id.* ¶¶ 42–43.) Until mid-January 2006, Sonfield directed or was aware of the sale of 12,200 Exobox shares from his legal assistant's account, for total gross proceeds of approximately $19,600. (*Id.* ¶ 43.) Sonfield told his legal assistant in January that he was "parking" the shares in her account and that they belonged to Defendants Lane and Brewer. (*Id.* ¶ 44.) On January 17, 2006, he directed her to transfer the remaining 437,800 shares of Exobox stock and $18,829 in Exobox proceeds to a brokerage account in Blankenship's name. (*Id.*) Sonfield had written, discretionary trading authority over this account, and sold 68,996 of these shares into the market for proceeds of approximately $628,486. (*Id.*) $25,000 of the proceeds was transferred by Sonfield and/or Blankenship to Landess, and wire transfers totaling $616,027 were made from the Blankenship brokerage account to a bank account in her name and then to an offshore entity controlled by Lane and Brewer. (*Id.* ¶ 45.) After the SEC began investigating Exobox, approximately $621,570 was returned to Blankenship's account. (*Id.*) No registration statement was filed and no other disclosure was made to the general public concerning these transactions. (*Id.* ¶ 46.)

On four occasions between October 2005 and July 2006,[3] Sonfield delivered 19 of the original Kilis' founders' certificates to Exobox's transfer agent for re-issuance as approximately

---

[3] On October 12, 2005, 35.19% of Exobox stock was transferred to these offshore entities; 12.42% was transferred on February 17, 2006; 18.63% on July 10, 2006; and 12% on July 31, 2006. (*Id.* ¶ 47.)

8.5 million post-split Exobox shares.   (*Id.* ¶ 47.)  Sonfield directed these certificates to be issued as unrestricted stock in the names of nine offshore entities controlled by Lane and Brewer.  (*Id.*)

Defendants Lane and Brewer directed the sale of approximately 8 million Exobox shares from these accounts, from which they obtained approximately $2.78 million that was transferred to their overseas bank accounts.  (*Id.* ¶ 48.)   Lane and Brewer used $500,000 of the above proceeds to pay to Sonfield for the benefit of Exobox for the preferred stock payment.  (*Id.* ¶ 50.)  No registration statement or notice of proposed sale was ever filed for any of these securities transactions. (*Id.* ¶¶ 49, 50.)

Similarly, the Bradleys and Landess sold many shares of Exobox stock in 2006 and early 2007 for substantial sums of money.  (*Id.* ¶¶ 51, 52.)  No one filed a registration statement or publicly disclosed those transactions.

Additionally, Sonfield prepared and filed a Form 10-SB registration statement on behalf of Exobox on December 21, 2005, which he subsequently amended by filing Form 10-SB/A on February 3, 2006.  (*Id.* ¶ 53.)   These filings omitted facts necessary to make the statements contained in the filings not misleading, including:

- Sonfield's control of at least 9.6 million shares or 88% of the company's outstanding common stock, which was purportedly unrestricted float;

- Sonfield's transfer of approximately 35% of Exobox's common stock to Lane and Brewer's entities;

- Sonfield's agreement to provide 10% of Exobox's common stock to the Bradleys and to Landess; and

- The fact that Exobox had no product, no operations, and no value.

(*Id.*)

Sonfield additionally prepared and filed two post-effective amendments to the Form-SB on March 8 and 9, 2006.  (*Id.* ¶ 54.)  These filings:

- Failed to disclose Sonfield, Lane, and Brewer's control of the Kilis certificates;

- Failed to disclose Sonfield's disposition of virtually all of Exobox's common stock after the Exobox merger;

- Failed to correct Exobox's ownership although Sonfield had transferred 47.61% of Exobox's stock prior to the filing of this document; and

- Erroneously continued to report that the principal of JinPin owned 1,350,000 shares of Exobox common stock even though Sonfield had directed the sale of 300,000 of those shares to a Lane and Brewer offshore entity, and Sonfield received blank stock powers for the sale of the remaining shares; and

- Stated that "as of the closing date [of the Exobox merger], Exobox Nevada was a non-operating blank check or shell corporation controlled by Donald C. Bradley, his wife, Shirlene Bradley, and their son, Jeff Bradley."  However, Sonfield's tradability letter of October 7, 2005 stated that the Bradleys affiliation with the company ceased as of June 22, 2005.

(*Id.*)

Sonfield also prepared and filed Exobox's Form 10-KSB for the fiscal year ending on July 31, 2006.  (*Id.* ¶ 55.)  This filing:

- Failed to disclose that Lane and Brewer controlled the vast percentage of the company's common stock; and

- Failed to disclose that Sonfield, Lane, and Brewer controlled and had beneficial ownership of the reportable percentages of Exobox's common stock.

7

(*Id.*)

Each of these filings deprived investors of material information, including the fact that Sonfield, Lane, and Brewer controlled the company's purportedly unrestricted common stock float.  (*Id.*)

In addition to the facts enumerated in their Amended Complaint, Plaintiffs "incorporate by reference, as if set forth verbatim herein, the factual allegations as set forth in Civil Action H-08-2351;  Securities and Exchange Commission vs. Robert L. Sonfield, et al., filed In the United States District Court for the Southern District of Texas, Houston Division."  (*Id.* ¶ 26.)

## II.   LEGAL STANDARD FOR MOTION TO DISMISS

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully.  *Id.*  A pleading need not contain detailed factual allegations, but must set forth more than "labels

and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 129 S. Ct. at 1950 (citation omitted). The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)). A district court can consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). Furthermore, a Court may refer to matters of public record when deciding a motion to dismiss. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that a plaintiff adequately pleads a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted); *Duke Energy Intern., L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 664–65 (S.D. Tex. 2010).  The Court should generally "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

### III.   STATE LAW CLAIMS

Plaintiffs assert claims of fraud and misrepresentation under the Texas common law. (Am. Compl. ¶¶ 87–88.)  Plaintiffs also include civil conspiracy claims in Count III.[4]  (*Id.* ¶ 90.) Moreover, Plaintiffs assert that "[t]he claims at issue concern . . . violation[s] of state . . . securities laws," and that "there are pendent claims for damages and injuries resulting from statutory and common law fraud, misrepresentation, gross negligence, and conspiracy to commit the violations of law."  (*Id.* ¶ 1.)

#### A.  Legal Standard

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb(f)(2) and 15 U.S.C. § 77p(c), precludes maintenance of a securities class action in state or federal court if: (1) the action is a "covered class action;" (2) the claims are based on state law; (3) the action involves one or more "covered securities;" and (4) the claims allege a misrepresentation or omission of material fact "in connection with the purchase or sale" of the security.  *In re Enron Corp. Securities*, 535 F.3d 325, 338–39 (5th Cir. 2008); 15 U.S.C. § 78bb(f).  Congress enacted SLUSA "to ensure that all causes of action involving allegations of misrepresentation or omission in connection with covered securities would be subject to the requirements of the Private Securities Litigation Reform Act of 1995."  *Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 702 (5th Cir. 2004).

#### B.  Analysis

Plaintiffs agree that "case law is clear that such claims are preempted at the federal level."  (Resp. to Sonfield's Mot. to Dismiss ¶ 4.)  Similarly, Plaintiffs do not respond to this

---

[4] The Court assumes that Plaintiffs' conspiracy claim is brought under state law, as Plaintiffs have not asserted any other basis for this claim.

allegation in Landess' Motion to Dismiss.  As Plaintiffs fail to advance any arguments that their claims do not fit the test articulated above, these claims must be dismissed.[5]

## IV. AIDING AND ABETTING CLAIMS

In Count III, Plaintiffs bring claims for aiding and abetting fraud and violations of securities laws.

### A. Legal Standard

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994), the Supreme Court determined that section 10(b) liability did not extend to aiders and abettors.  Subsequently, Congress declined to extend the section 10(b) private right of action to claims against secondary actors, and instead, in the PSLRA, directed prosecution of aiders and abettors by the SEC.  *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 158 (2008).  Accordingly, a secondary actor is not liable for violations unless he satisfies all the requirements for liability under section 10(b).

### B. Analysis

In their responses, Plaintiffs do not argue that aiding and abetting liability is appropriate. Instead, they argue that Sonfield is a primary actor and therefore must be held responsible for the acts and statements identified in the Complaint.  Similarly, Plaintiffs do not address aiding and abetting liability in response to Landess' or Exobox's Motions to Dismiss.  Therefore, the Court finds that all aiding and abetting claims must be dismissed.[6]

---

[5] Although Plaintiffs agree that their state law claims are precluded under SLUSA, Landess' Motion to Dismiss states that Plaintiffs have a remaining "federal common law claim for fraud under FRCP Rule 9(b)" and cites the elements of fraud under Texas law (Landess Mot. to Dismiss at ¶¶ 14–15.)  The Court wishes to make clear that Plaintiffs claims of fraud are claims under state common law, and therefore are dismissed under the SLUSA preclusion argument articulated by Sonfield, Exobox, and Landess.

[6] Count III also includes claims of conspiracy.  In Part III, *supra*, the Court found that these claims should be dismissed because they are state common law claims.

## V. FEDERAL SECURITIES LAW CLAIMS

Plaintiffs also bring claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5.

### A. Legal Standard

Under section 10(b) of the Securities Exchange Act of 1934,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

> Pursuant to this section, the SEC promulgated Rule 10b–5, which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.  To state a private 10(b) claim, a plaintiff must allege (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Stoneridge*, 552 U.S. at 157; *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–42 (2005); *R2 Invs.,* 401 F.3d at 641.

A plaintiff pleading a false or misleading statement or omission as the basis of a 10(b) claim must: (1) specify each statement alleged to have been misleading; (2) identify the speaker;

(3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002); *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 533 (5th Cir. 2008). These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *ABC Arbitrage*, 291 F.3d at 350. The PSLRA's particularity requirement incorporates, at a minimum, the pleading standard for fraud actions under Rule 9(b). *Rosenzweig v. Azurix*, 332 F.3d 854, 866 (5th Cir. 2003).

To be actionable, a misrepresentation or omission of a fact must be material. The Supreme Court recently reaffirmed its long-standing holding that there is no "bright-line rule" for determining whether information withheld from a company's filings is material as a matter of law. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318–23 (2011). Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information. *Id.* at 1321. Under Fifth Circuit construction, the appropriate inquiry is whether, under all the circumstances, the statement or omitted fact is one that a reasonable investor would consider significant in making the decision to invest, "such that it alters the total mix of information available about the proposed investment." *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1445 (5th Cir. 1993); *see also Basic Inc. v. Levinson,* 485 U.S. 224, 232 (1988). Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubenstein v. Collins,* 20 F.3d 160, 168 (5th Cir. 1994).

In order to state a claim under section 10(b), a plaintiff also must have relied on the defendants' acts or statements. *Stoneridge*, 552 U.S. at 159. Requiring a plaintiff to plead reliance ensures "the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Id.* (citing *Basic*, 485 U.S. at 243). A rebuttable presumption of reliance exists in two circumstances: (1) when a plaintiff was owed a duty to disclose, or (2) when the statements become public, as the public information is reflected in the market price of the security. *Id.* However, no reliance is presumed when a defendant's specific acts were not disclosed to the investing public, even when information about a defendant's deceptive transactions is later incorporated into a false public statement. *Id.* at 161.

Furthermore, section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate mismanagement. *Shaw Group, Inc.,* 537 F.3d at 535. Under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a defendant. Rather, to establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319 (2007). Scienter, in the context of securities fraud, is defined as "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,* 565 F.3d 200, 207 (5th Cir. 2009).

A plaintiff may meet his scienter pleading obligation by pleading facts giving rise to a strong inference of reckless or conscious misconduct. *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 425 (5th Cir. 2001). Under the PSLRA, the Court considers whether all the facts and circumstances, taken together, give rise to a strong inference of scienter. *Tellabs, Inc.,* 551 U.S.

14

at 322–23; *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 431 (5th Cir. 2002). To qualify as "strong" within the meaning of the statute, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent. *Tellabs, Inc.,* 551 U.S. at 309.

Moreover, the Fifth Circuit does not allow a "group pleading approach" to establishing scienter. *Southland*, 365 F.3d at 363–65. The court must look only to the state of mind of the individual who made or issued the statement or furnished information for use in the statement, and not to the collective knowledge of the corporation's officers and employees acquired in the course of their employment. *See Shaw Group,* 537 F.3d at 534. The complaint must specifically connect individual defendants to the statements or omissions, otherwise it will fail under the PSLRA's heightened pleading standard. *Fin. Aquisition Partners LP v. Blackwell,* 440 F.3d 278, 287 (5th Cir. 2006).

The Supreme Court's recent decision in *Janus Capital Group v. First Derivative Traders*, 564 U.S. --, 131 S. Ct. 2296 (2011), defined who can "make" a statement in the context of Rule 10b–5. The Court rejected the plaintiffs' argument that "make" should be defined as "create," and held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 131 S. Ct. at 2302. The Court held that Janus Capital Management (JCM) could not be held liable for statements in prospectuses filed by Janus Investment Fund. JCM was the investment advisor and administrator of Janus Investment Fund and a wholly-owned subsidiary of Janus Management Group, which also created Janus Investment Fund as a separate legal entity owned by mutual fund investors. The Court observed that "it is undisputed that the corporate formalities were observed here," and JCM and Janus Investment Fund remained legally separate entities. *Id.* at

2304.  Therefore, JCM's participation in the writing and dissemination of the prospectuses was not sufficient, as JCM did not retain "ultimate authority" over the statement.   The Court compared this situation to the relationship between a speech and a speechwriter, noting that "[e]ven when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit—or blame—for what is ultimately said."  *Id.* at 2302.  The Supreme Court further attempted to distinguish liability under Rule 10b–5 from liability under section 20(a), 15 U.S.C. § 78t(a).   The Court found that the plaintiffs' theory of liability too closely resembled, and would expand, the liability Congress already created under section 20(a).  *Id.* at 2304 ("Congress also has established liability in § 20(a) for '[e]very person who, directly or indirectly, controls any person liable' for violations of the securities laws." (citing 15 U.S.C. § 78t(a))).

### B.  Analysis

#### 1.  Claims against Defendant Sonfield

In Plaintiffs' Response, Plaintiffs identify the statements and actions that form the basis of their claims against Sonfield, which the Court believes can be placed into three categories: (1) Sonfield's actions and misrepresentations to others, such as statements made in the process of orchestrating the reverse merger of Exobox and JinPin,  engaging the expert to value Exobox, and issuing and ultimately transferring shares to his legal assistant, the Bradleys, Lane, and Brewer; (2) Sonfield's tradability opinion letter to Pink Sheets; and (3) Exobox's public filings with the SEC, which were prepared by Sonfield.

##### a.  Statements to Others

Plaintiffs fail to plead sufficient reliance to state a claim based on the first category outlined above.  Plaintiffs do not claim that they knew about these acts at the time they occurred

or relied on them in any way.  Sonfield's misrepresentations in this category were not made to the public, but rather only to the parties involved in these transactions.  Therefore, Plaintiffs fail to state a claim for section 10(b) or Rule 10b–5 liability based on these statements and actions.

### b.  Sonfield's Tradability Letter to Pink Sheets

Additionally, Plaintiffs assert that "Sonfield prepared and submitted a tradability opinion letter to the Pink Sheets, LLC claiming that virtually all shares of Exobox 'may be sold immediately in the public market by [sic] . . . on  the safe harbor of Rule 144(k) under the Securities Act.'"  (Am. Compl. ¶ 40.)   Plaintiffs plead scienter adequately.  Plaintiffs allege that Sonfield himself was involved in fraudulently backdating the shares, and therefore, that he knew the statements in the tradability letter were false.  (Am. Compl. ¶¶ 34, 40, 42.)  Plaintiffs aver that this was just one part of his scheme to issue and sell securities to make substantial sums of money for himself and the other defendants.

Plaintiffs' Amended Complaint also provides enough information to conclude that this misstatement is material.  The Court finds that a signed statement of a lawyer, representing that the shares were subject to the safe harbor of Rule 144(k) and could therefore be sold without registration, would be significant to a potential investor in deciding whether to buy Exobox shares, as "it alters the total mix of information available about the proposed investment." *Krim,* 989 F.2d at 1445.

In the fact section of the complaint in *Securities and Exchange Commission v. Robert L. Sonfield, et al.*, 08-cv-2351 (S.D. Tex.) ("SEC Complaint"), the SEC notes that Sonfield's letter was "posted on the Pink Sheets website."  (SEC Compl. ¶ 33.)  Because Sonfield's statements about Exobox's tradability were public, Plaintiffs are entitled to a presumption of reliance.  *See Basic,* 485 U.S. at 247.  The factual allegations of the SEC Complaint were incorporated by

reference into Plaintiffs' Complaint in the present action.  (Am. Compl. ¶ 26.)  Federal Rule of Civil Procedure Rule 10(c) provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion."  Sonfield also acknowledges Plaintiffs' incorporation of the factual allegations from SEC Complaint in his motion.  (Sonfield's Mot. to Dismiss ¶¶ 4, 22 n.8.)  While the Court notes that the Fifth Circuit has been reluctant to allow an incorporation by reference to another case, these cases involved plaintiffs who were trying to incorporate claims from complaints in other cases, rather than mere allegations.  *See Texas Water Supply Corp. v. R. F. C.*, 204 F.2d 190, 197 (5th Cir. 1953); *see also Muttathottil v. Gordon H. Mansfield*, 381 Fed. Appx. 454, 456–58 (5th Cir. 2010).  Defendants were on notice of the factual claims asserted in the SEC Complaint, as this case was filed in the same court against many of the same defendants sued in this action, including Sonfield.  However, in light of the Fifth Circuit's hesitation to allow incorporation by reference to another case, even where defendants clearly had notice, *see Muttahottil*, 381 Fed. Appx. at 457, the Court finds it appropriate to allow Plaintiffs to replead this allegation in order to state a claim.

### c.  Exobox's Public Filings

Plaintiffs also allege that Sonfield violated Rule 10b–5 by making misstatements in Exobox's filings with the SEC.  Sonfield argues that, under *Janus*, he did not make any statements for purposes of Rule 10b–5.  Sonfield notes that, at a minimum, "attribution is necessary" to "find that a person or entity made a statement."  *Janus*, 131 S. Ct. at 2305.  The filings at issue were submitted by Exobox and signed by Robert Dillon, Exobox's President and Chief Executive Officer.  Form 10-KSB was additionally signed by Michael G. Wirtz, Exobox's Chief Financial Officer.  Sonfield did not sign the filings himself.

Plaintiffs assert that this case can be distinguished from *Janus* because Sonfield was in "control of" Exobox, as he owned 100% or 88% of Exobox at the relevant times, whereas Janus Investment Fund was a separate legal entity from JCM.  (Resp. to Sonfield's Suppl. Reply ¶ 2.)  Even assuming that Sonfield did control Exobox, as Plaintiffs assert,[7] Plaintiffs fail to show that Sonfield had "ultimate control" over the statements, as *Janus* requires.  The Supreme Court held that "the maker of a statement is the person or entity with ultimate authority *over the statement*"; just because a person or entity may "control" the company filing the document does not mean that the control person can be liable under 10b–5 for making the statements.  *Janus*, 131 S. Ct. at 2302 (emphasis added).  In their response to Sonfield's supplemental reply, Plaintiffs appear to be quoting *Janus* in asserting that "[t]he Supreme Court looked to whether such a person/entity had 'control' over the entity making the statement such that the statement would become that 'controlling person's' statement."  (Response to Supp. Reply ¶ 1.)  However, the only time the Supreme Court used the phrase "controlling person" was to reference liability under section 20(a).  *Janus*, 131 S. Ct. at 2301.  The Court rejected the argument Plaintiffs assert here, distinguishing liability under 10b–5 from liability under section 20(a).  *Id.* at 2304 (declining to "read into Rule 10b–5 a theory of liability similar to—but broader in application than—what Congress has already created expressly elsewhere." (internal citations omitted)).  Plaintiffs' Amended Complaint does not contain a claim under section 20(a).  Therefore, under the facts contained in the Amended Complaint, Sonfield may not be held liable for statements in Exobox's registration filings, even if he supplied Exobox with the false statements at issue.

---

[7] Sonfield disputes that he owned all the common stock in question.  However, even if this allegation were true, he claims this would be equivalent to a mere 3% voting interest.  (Sonfield Second Supplemental Reply ¶ 5.)  The officers and directors controlled 97% of the voting power.  (*Id.*)  The Court need not resolve this factual dispute at this stage of the litigation.

Sonfield notes that his name appears in certain transaction documents attached as exhibits to Exobox's filings.  (Sonfield's Mot. to Dismiss ¶ 6 n.5.)  These pages note that Sonfield received copies of various notices and transmitted correspondence to the SEC identifying the revisions to the statements.  (Doc. No. 18-3, Form 10-SB12G/A No. 1 at 56–58; Doc. No. 18-4, Form 10-SB12G/A No. 2 at 57.)  Exobox's Form 10-SB12G form additionally contains an opinion letter signed by Sonfield, which notes the availability of an exemption from registration under the 1933 Act.  (Doc. No. 18-1, Form 10-SB12G, at 201, 252–55.)  However, Plaintiffs' Amended Complaint does not identify any misstatements or omissions from the pages signed by Sonfield.  Sonfield was not a signatory to the public filings; they were signed by Exobox's President and CEO as well as Exobox's CFO in one instance.  The attached statements signed by Sonfield appear to be separate from the substantive registration filings, merely notifying the SEC of the updates.  Thus, the Court finds that Plaintiffs' Amended Complaint does not provide sufficient allegations about the letters and attachments to support a finding that Sonfield "made" any statements in Exobox's public filings.

The Court grants Plaintiffs leave to amend their Complaint on this narrow basis—to show which, if any, misstatements or omissions in the public filings forming the basis of Plaintiffs' 10b–5 claims were "made" by Sonfield, pursuant to *Janus* and this Order.  The Court believes that leave to amend is appropriate because Plaintiffs' previous amendment to their complaint came before the Supreme Court's decision in *Janus* provided this narrow interpretation of the word "make."

### 2. Claims against Defendant Landess

Plaintiffs' claims against Defendant Landess under section 10(b) and Rule 10b–5 must be dismissed, as Plaintiffs do not plead these claims with the particularity required under the PSLRA.

Plaintiffs assert that Landess "filed certain documents with the Nevada Secretary of State reporting Kilis had changed its name to JinPin and the principal of JinPin had become Kilis' sole officer and director."  (Am. Compl. ¶ 35.)  That paragraph asserts that *Sonfield* knew that these filings and representations were false, as the JinPin merger never closed, but the Complaint says nothing about Landess' scienter with respect to this filing.  (*Id.*)  Additionally, under *Janus*, the Court cannot conclude that Landess made the statement in this filing with the Nevada Secretary of State.  Plaintiffs did not provide a copy of this document for the Court's review or assert why they believe Landess made this statement, which appears to be a corporate filing for Kilis or JinPin.  Furthermore, Plaintiffs fail to assert why this name change is material and would affect Plaintiffs' investment decisions.

Plaintiffs also assert that Landess "undertook steps to facilitate the public trading of Exobox stock."  (Am. Compl. ¶ 40.)  The Complaint does not specify what any of these "steps" are.  That paragraph asserts that *Sonfield* issued a tradability letter, but does not provide any information suggesting that Landess also contributed to that statement.  While the Complaint alleges that Landess tried to convince the valuation expert to provide a false value to Exobox, the expert elected to do nothing, stating that he could not make such a valuation.  (*Id.* ¶ 39.)  Plaintiffs have failed to plead any specific statements or actions of Landess that could form the basis of their federal securities law claims.

In Plaintiffs' Response, they also assert that Landess should be held liable for violations of section 10(b) and Rule 10b–5 based on "the actions undertaken by Sonfield with the full knowledge of Landess so that Landess was/is a co-conspirator." (Response to Landess' Mot. to Dismiss ¶ 10.) However, as noted in Part III, *supra*, Plaintiffs' claim of conspiracy has been dismissed as a state law claim. Therefore, all claims against Defendant Landess must be dismissed.

### 3.   Claims against Defendant Exobox

Exobox's Motion for a More Definite Statement alleges that Plaintiffs have not adequately established which actions can be attributed to Defendant Exobox. "The allegations in Part IV [containing the factual background] as to Exobox are either innocuous, mention Exobox only in passing, or make vague allegations without any supporting basis." (Exobox's Mot. for a More Definite Statement ¶ 4.) Additionally, Exobox's Motion to Dismiss alleges that Plaintiffs' federal securities law claims are not alleged with the specificity required by the PSLRA. Exobox incorporates Sonfield's Memorandum in support of his Motion to Dismiss. (Exobox's Mot. to Dismiss ¶ 8.)

Similarly, Plaintiffs' late-filed response refers the Court to the arguments contained in their Response to Sonfield's Motion. (Resp. to Exobox's Mot. to Dismiss ¶ 2.)[8] Indeed, Plaintiffs' Response alleges Exobox's liability only with respect to actions taken by Sonfield, with one exception—Plaintiffs also assert that Exobox should be held liable for Landess' "false filings with the Nevada Secretary of State at a time when Sonfield retained control of virtually all of the outstanding Kilis shares of stock." (*Id.* ¶ 4 (citing Am. Compl. ¶ 34).) As noted above,

---

[8] The Court grants Plaintiffs' Motion for Leave to File (Doc. No. 53) and will allow the late-filed response, as it consists primarily of arguments made in its Response to Sonfield's Motion. The Court finds that Exobox's substantial rights are not affected by this late filing. *See Garza v. Laredo Independent School Dist.,* 309 Fed. Appx. 806, 811 (5th Cir. 2009) (quoting Fed. R. Civ. P. 61).

Plaintiffs fail to provide any explanation as to why this name change is material and could affect investment decisions.  Moreover, the basis for Exobox's liability for alleged misstatements involving Kilis and JinPin is unclear, especially because, in the same paragraph, Plaintiffs alleged that the "JinPin merger never closed."  (Am. Compl. ¶ 35.)

### a.  Statements to Others

As the Court stated in Part V.B.1.a., *supra*, Plaintiffs fail to plead sufficient reliance to state a claim based on Sonfield's private statements to individuals such as his legal assistant, the expert, and others.  Accordingly, these misrepresentations must be dismissed.

### b.  Sonfield's Tradability Letter to Pink Sheets

Plaintiffs believe that Exobox should be liable for Sonfield's tradability opinion letter, because it "was done by Sonfield at a time when he still owned and controlled more than a mere majority of the Exobox stock." (Resp. to Exobox's Mot. to Dismiss ¶ 5.)  However, Plaintiffs point to no theory of liability to support their argument that Exobox should be held liable for any misrepresentations made by Sonfield based solely on Sonfield's control of a majority of the Exobox stock.[9]  Plaintiffs also argue that "Exobox adopted these statements, and is, thus, also responsible for such misrepresentation[s]."  (*Id.*)  On the basis of the facts contained in the Amended Complaint, however, Exobox cannot be said to have "made" the statements contained in the tradability letter under *Janus*.  There is no indication that this letter was submitted or filed by Exobox; the fact that Plaintiffs called it an "opinion letter" implies that the letter expressed Sonfield's own opinion as an attorney.  Even before the Supreme Court's decision in *Janus*, courts found that corporations generally were not liable for statements made by third parties on

---

[9] This argument is akin to control person liability under section 20(a).  However, while Section 20(a) provides that a control person is liable for the violations of the entity it controls, the converse is not true—the controlled entity is *not* liable for every action taken by the control person.  15 U.S.C. § 78t(a).  Moreover, as noted above, Plaintiffs' Amended Complaint does not contain a claim for control person liability under section 20(a).

their behalf.  *See Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("The securities laws require [a company] to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to [the company].")   Without allegations that Exobox had ultimate authority over the statement, the Court may not determine that Exobox made the statement and thus can be liable under section 10(b) and Rule 10b–5.

### c.   Exobox's Public Filings

Plaintiffs also assert that Sonfield, acting on behalf of Exobox, made material misrepresentations in its registration filings.  The Court has already found that, under *Janus*, Sonfield did not make the representations at issue.  *See* Part V.B.1.c., *supra*.  In contrast, Exobox was the entity with ultimate authority over the statement, *Janus*, 131 S. Ct. at 2302, and Exobox is listed as the "filer" of the registration forms and amendments at issue.  *Id.* at 2304–05.  (Doc. No. 18-1, Form 10-SB12G, at 1.)  Therefore, Exobox "made" the statements at issue.

The question thus becomes whether Exobox had scienter when it made the statements contained in its registration filings and amendments.  In determining whether the Complaint adequately pleads scienter with respect to Exobox, the Court must look to see if any of the corporate officials who made or prepared the statement acted with scienter.  The standard articulated by the Fifth Circuit in *Southland*, and repeated in many subsequent cases, provides that it is appropriate to look at the state of mind not only of the individual corporate official or officials who made the statement, but also those who "order or approve it or its making or issuance, or who furnish information or language for inclusion therein or the like." *Id*; *see also Shaw Group*, 537 F.3d at 533 (repeating this standard post-*Stoneridge*).  The Court finds no reason to read *Janus* to limit the liability of the corporation on grounds of scienter.  Exobox

"made" the statements contained in the public filings under *Janus*; Plaintiffs need only assert that Sonfield furnished the information or language for inclusion in order to attribute his scienter to Exobox.

On the facts alleged, Sonfield was a corporate official.  Plaintiffs assert that Sonfield was in "control of" Exobox, as he owned 100% or 88% of Exobox at the relevant times (Response to Sonfield's Suppl. Reply ¶ 2).  He served as Exobox's lawyer and prepared the filing statements at issue.  Thus, Sonfield certainly qualifies as an "official," as he was "authorized to act" for Exobox in drafting its filing statements.  Black's Law Dictionary 1119 (9th ed. 2009); *see also Teachers' Retirement System of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) ("[T]he plaintiff must allege facts that support a strong inference of scienter with respect to at least one *authorized agent* of the corporation." (emphasis added) (citing *Southland*, 365 F.3d at 363–67)).  Thus, Sonfield's scienter may be attributed to Exobox under *Southland*.

Plaintiffs allege adequately that Sonfield had the requisite state of mind when making false statements in the registration filings.  The misrepresentations and information that Exobox failed to disclose largely involved Sonfield's ownership interests and transactions that Sonfield made with others.  (Am. Compl. ¶¶ 53–55.)  Additionally, Plaintiffs plead that Sonfield was aware, through his dealings with the expert that he hired, that Exobox had no product, no operations, and no value.  (*Id.* ¶¶ 39, 53(d).)  The filings also directly contradicted a statement that Sonfield made in his tradability letter. (*Id.* ¶ 54(a).)  Each of these allegations fits within the scheme that Plaintiffs allege, and the Court finds sufficient facts to give rise to a strong inference that Sonfield committed this misconduct recklessly or consciously.

Moreover, the misstatements contained in the filings satisfy the materiality requirement.  Plaintiffs aver that the filings "deprived investors of material information, including the fact that

[Sonfield], Lane[,] and Brewer controlled the company's purportedly unrestricted common stock float." (*Id.* ¶ 55.)  Because the filings were public, Plaintiffs are also entitled to a presumption of reliance.  *See Basic*, 485 U.S. at 247.  Therefore, the Court finds that Plaintiffs' Amended Complaint states a claim against Exobox for violation of section 10(b) and rule 10b–5 with respect to the statements in Exobox's public filings.

Accordingly, the Court finds it appropriate to deny Exobox's Motion for a More Definite Statement.  Plaintiffs' claims against Exobox are limited to the misstatements contained in Exobox's public filings, which the Amended Complaint clearly, and appropriately, attributes to Exobox.  (*See* Am. Compl. ¶ 53 ("Sonfield prepared and filed a Form 10-SB registration statement *on behalf of Exobox*.").)

### 4.  Amendment

The Court previously allowed Plaintiffs the opportunity to amend their complaint.  (*See* Minute Entry for proceedings held before Judge Keith P. Ellison, 12/14/2010.)  Plaintiffs did not request leave to amend in connection with any of the pending motions to dismiss, and they failed to respond to Exobox's Motion for a More Definite Statement.  Therefore, the Court will allow Plaintiffs leave to amend only on the narrow bases identified in this order: 1) to add factual allegations relating to the public disclosure of Sonfield's tradability letter; and 2) to plead any additional facts showing that, under *Janus*, Sonfield "made" any misstatements in Exobox's public filings.

## VI.   CONCLUSION

For the reasons discussed in this order:

(1) Sonfield's Motion to Dismiss (Doc. No. 17) is **GRANTED IN PART**;

(2) Landess' Motion to Dismiss (Doc. No. 46) is **GRANTED**;

(3) Exobox's Motion to Dismiss (Doc. No. 47) is **GRANTED IN PART**;

(4) Exobox's Motion for a More Definite Statement (Doc. No. 45) is **DENIED**; and

(5) Plaintiffs' Motion for Leave (Doc. No. 53) is **GRANTED**.

Plaintiffs may file an amended complaint within 20 days in accordance with the Court's aforementioned instructions.


**IT IS SO ORDERED**.

**SIGNED** in Houston, Texas, on this the 23rd day of January, 2012.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE